[S.F. No. 23131. In Bank. June 23, 1975.]

In re the Marriage of ESTHER and RICHARD MIX.
ESTHER MIX, Respondent, v.
RICHARD MIX, Appellant.

## COUNSEL

Gualco, Hummel & Quirk, Elizabeth Inglis Hummel and Robert W. Kirby, Jr., for Appellant.

Brian D. Flynn for Respondent.

## OPINION

**SULLIVAN, J.**—In this action for dissolution of marriage, appellant Richard Mix (Richard) appeals from an interlocutory judgment of dissolution declaring that appellant and respondent Esther Mix (Esther) are entitled to have their marriage dissolved, awarding custody of the minor child of the parties to Esther, and dividing their community property. Richard attacks the finding that, except for the property specifically found to be community, all property both real and personal standing in Esther's name or being in her possession at the time of the separation was her separate property.

Richard and Esther were married on September 4, 1958, and separated on December 14, 1968. There is one child of the marriage, a boy born February 24, 1960. At the time of marriage Esther was an attorney admitted to practice in California and Richard a musician and part-time teacher. Thereafter, they continued to pursue their respective careers. At the start, Esther was an associate in a law firm earning approximately $400 a month; by the time of her separation, she had

become a 40 percent partner in the firm and earned about $25,000 annually. Richard's career as a musician, including regular employment with the Sacramento Symphony Orchestra, proved to be a good deal less remunerative; his annual income was generally between $1,000 and $3,000.

At the time of her marriage Esther owned considerable property. This included interests in income producing real property, a residence, a life insurance policy and bank accounts of indeterminate amounts. At that time Richard closed his savings account and the parties changed his checking account at the Bank of America into their joint account. In this new checking account, the parties deposited all their earnings as well as Esther's income from her separate property. This practice continued until 1963 when Esther opened an account in her name alone at the California Bank. In this account she deposited most of her income both from her law practice and her various investments.

The trial court found, so far as is here pertinent, that specific items of property were community property and, on the basis that it would effectuate a substantially equal division, awarded them as follows: (1) to Esther, the equity in the home of the parties, an Oldsmobile automobile, the interest in Esther's law partnership, an undivided one-sixth interest in 10 acres of real property, the household furniture and furnishings, and a tennis club membership; (2) to Richard, two sailboats, a Volkswagen automobile and the sum of $6,137. As previously stated, the court found that all other property, both real and personal, standing in Esther's name or being in her possession was her separate property.[1] This is the finding upon which the present controversy centers.

We therefore find it convenient at this point to list the items of separate property which are the subject of the controversy:

1. *Proceeds of sale of Balboa Circle home.*

Upon their marriage Richard and Esther moved into the latter's home on Balboa Circle in Sacramento, where they resided until 1966. The property was encumbered by a mortgage securing a loan which at the time of the marriage had an unpaid balance of about $15,000. During the marriage Esther paid the loan installments and the taxes on the property

---

[1]Four items of Esther's separate real property are listed on an exhibit attached to both the findings of fact and conclusions of law, and the interlocutory judgment. Neither the findings nor the judgment list the remaining items of Esther's separate property.

by checks drawn on the commingled bank accounts. Checks were drawn on the same accounts to pay for capital improvements. After she commenced the present action,[2] Esther sold the home and deposited the net proceeds of $22,312.48 in an account in the Capital Federal Savings and Loan Association. Richard claims a community interest in the proceeds on the basis that the loan installments and the capital improvements were paid from the commingled accounts.

2. *Equitable Life Insurance Policy.* Esther had a life insurance policy issued to her in 1957 as a condition to obtaining a loan on the Balboa Circle home. The premiums were included in the loan payments and were accordingly paid during marriage by checks drawn by Esther on the commingled bank accounts. Richard maintains that 90 percent of the cash value of the policy constitutes community property.

3. *Cash on Hand.* Richard claims the balance of $3,392.15 in Esther's separate account on the date of trial after payment of the community obligations following separation, was community property. He also claims a community interest in the $1,000 balance owing on a loan Esther made to one Harvey Shank.

4. *Real property.* Prior to her marriage Esther and her law associate, later her law partner, each acquired an undivided one-half interest in a lot improved with a single family residence on 18th Street in Sacramento. In 1965 the house was destroyed by fire. Esther and her law partner used the $12,000 collected from insurance on the property together with $29,000 in borrowed money to build a fourplex on the lot. Richard claims a community property interest in the building, but not in the land, on the asserted basis that the building was constructed during marriage and that Richard was an obligor on the note.

In October 1958, a month after her marriage, Esther and her law partner each acquired an undivided one-half interest in unimproved real property on 20th Street in Sacramento. In purchasing her interest, Esther used separate funds on deposit in an account in her name in the Wells Fargo Bank which was one of the accounts she had before her marriage. Subsequently she and her partner borrowed $54,600 to construct an office building on this property, Richard being a trustor on the deed of trust and obligor on the note. Esther invested an additional $9,000 in the

---

[2]The action was commenced on December 20, 1968, as one for divorce and upon taking effect of the Family Law Act (Stats. 1969, ch. 1608, § 8; Civ. Code, § 4000 et seq. effective Jan. 1, 1970) proceeded as one for dissolution of marriage under that act.

project, $4,000 from the commingled bank accounts and $5,000 from her separate property. Richard claims a community interest on the alleged grounds that the property was acquired during marriage, that he was involved in its financing and that the $4,000 contribution had come from commingled funds.

About three months later, in January 1959, Esther, her law partner, and two other persons each acquired an undivided one-fourth interest in an unimproved parcel of land on Newman Court in Sacramento. Esther testified that she paid $6,466.44 for her interest, withdrawing that amount from her account at the Wells Fargo Bank. The joint venturers borrowed $124,000 and built an apartment house on the property. Their loan was secured by a mortgage on the property. Subsequently Esther contributed an additional $4,121.91 to the joint venture, withdrawing the funds from the joint checking account maintained by her and Richard. The latter claims that Esther's interest in the joint venture is community property on the basis that she acquired it during marriage and also contributed the above funds from the commingled bank account.

In 1963 the same joint venturers purchased an additional parcel of land on Newman Court, borrowed $324,000 and built an apartment house on the property. The loan was secured by a mortgage on the property. Esther later contributed $5,100.92 to the joint venture for the acquisition of the property, again using funds from the joint account. Richard makes the same claim as to the community property character of this property.

After making a general finding[3] that all of the foregoing property which stood in Esther's name was her separate property, the trial court went on to state: "All of such property which was acquired during the marriage of the parties in the name of petitioner [Esther] was taken in petitioner's name with the knowledge of respondent [Richard] and with the understanding of the parties that it was to be held as petitioner's separate property. Said property was purchased with petitioner's separate funds which were identified and traced by petitioner. Any improvement made during marriage to petitioner's separate property, and any separate property purchased with funds from any bank account in which

---

[3]The court found as follows: "11. Except for the property hereinabove expressly found to be community, all property, both real and personal, standing in the name of petitioner [Esther] or being in her possession, is found to be petitioner's separate property, and all personal property standing in the name of respondent [Richard] or being in his possession is found to be respondent's separate property."

both separate and community funds were comingled [sic], were made either by respondent or with his knowledge and consent with the intent that such improvements or property would belong to petitioner, and there was at all times a sufficient balance of separate property deposited to such accounts to cover all such amounts withdrawn. All borrowed funds used to improve petitioner's separate property were the proceeds of loans obtained upon the hypothecation of such separate property, and in making such loans the lender did not rely on the credit of the community. Such funds are the separate property of petitioner."

It thus appears that the trial court rested its finding as to Esther's separate property on two independent bases: (1) that Esther had adequately traced the source of the funds withdrawn from the commingled bank accounts for use in connection with the aforementioned properties to her separate funds; (2) that there was an agreement between Richard and Esther that all property purchased by the latter in her own name during marriage was to be her separate property.

The following legal principles apply: "All property of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is her separate property." (Civ. Code, § 5107.)[4] ■ Property purchased with the wife's separate property funds is her separate property. (*Huber* v. *Huber* (1946) 27 Cal.2d 784, 791 [167 P.2d 708]; *Thomasset* v. *Thomasset* (1953) 122 Cal.App.2d 116, 124 [264 P.2d 626].) The wife's earnings during the marriage are community property and are subject to her management and control. (§ 5124.)[5]

Real or personal property, or any interest therein or encumbrance thereon, acquired by a married woman by an instrument in writing is presumed to be her separate property. (§ 5110.)[6] ■ However, "[p]roperty acquired by purchase during a marriage is presumed to be

---

[4]Hereafter, unless otherwise indicated, all section references are to the Civil Code.

[5]Section 5124 was repealed effective January 1, 1975, because as of that date either husband or wife has the control and management of all community property. (See §§ 5125, 5127, as amended by Stats. 1973, ch. 987, §§ 14, 15, p. 1901, both operative Jan. 1, 1975.)

[6]As amended by Statutes 1970, chapter 517, section 1, page 1011, operative until January 1, 1975. The same provisions remain intact in section 5110 as further amended by Statutes 1973, chapter 987, section 5, page 1898, operative January 1, 1975, with respect to property acquired by a married woman in writing prior to January 1, 1975. There is no such presumption as to property acquired after January 1, 1975, because from that date the wife has joint management of all community property. (See fn. 5, *ante.*)

community property, and the burden is on the spouse asserting its separate character to overcome the presumption. [Citations.]" (*See* v. *See* (1966) 64 Cal.2d 778, 783 [51 Cal.Rptr. 888, 415 P.2d 776].) This presumption applies to property purchased during the marriage with funds from a disputed source, such as an account or fund in which one of the spouses has commingled his or her separate funds with community funds. (*See* v. *See, supra,* 64 Cal.2d 778, 783; see *Estate of Neilson* (1962) 57 Cal.2d 733, 742 [22 Cal.Rptr. 1, 371 P.2d 745].) ■ "The mere commingling of separate with community funds in a bank account does not destroy the character of the former if the amount thereof can be ascertained." (*Hicks* v. *Hicks* (1962) 211 Cal.App.2d 144, 154 [27 Cal.Rptr. 307]; see *Huber* v. *Huber, supra,* 27 Cal.2d 784, 791; *Patterson* v. *Patterson* (1966) 242 Cal.App.2d 333, 341 [51 Cal.Rptr. 339], disapproved on other grounds in *See* v. *See, supra,* 64 Cal.2d at p. 784; *Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116, 124.) As the court in *Patterson* stated: "If the property, or the source of funds with which it is acquired, can be traced, its separate property character remains unchanged. [Citations.] But if separate and community property or funds are commingled in such a manner that it is impossible to trace the source of the property or funds, the whole will be treated as community property . . . ." (*Patterson* v. *Patterson, supra,* at p. 341.)

■ During the marriage of Richard and Esther the law bestowed on Richard the management and control of the community personal property other than Esther's earnings and on Esther the management and control of her community property earnings and separate property rents, issues and profits, with other exceptions not here applicable. (§§ 5124, 5125, and see fn. 5, *ante;* see also §§ 5113.5, 5128.) Thus under the law and the undisputed facts Esther had the management and control of the commingled bank accounts at the California Bank. Because the presumption in section 5110 that any interest in property acquired by a married woman in writing is her separate property will have no further effect after the wife acquires joint management of all community property on January 1, 1975 (see fn. 6, *ante*), it should likewise not apply when the wife had management and control of the bank account in question. Otherwise, the wife managing a commingled account could by this device insulate herself from the rules applicable to commingling. We conclude therefore that the controlling presumption in this case is the one that property acquired during marriage is community property. (*See* v. *See, supra,* 64 Cal.2d 778, 783.)

■ The presumption that all property acquired by either spouse during the marriage is community property may be overcome. (*See* v.

*See, supra,* 64 Cal.2d at p. 783; *Estate of Niccolls* (1912) 164 Cal. 368, 371 [129 P. 278]; *Patterson* v. *Patterson, supra,* 242 Cal.App.2d 333, 341; *Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116, 123.) Whether or not the presumption is overcome is a question of fact for the trial court. (*Machado* v. *Machado* (1962) 58 Cal.2d 501, 506 [25 Cal.Rptr. 87, 375 P.2d 55]; *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 212 [259 P.2d 656]; *Pack* v. *Vartanian* (1965) 232 Cal.App.2d 466, 470 [42 Cal.Rptr. 729].) Generally speaking such post-marital property can be established to be separate property by two independent methods of tracing. The first method involves direct tracing. As the court explained in *Hicks:* "[S]eparate funds do not lose their character as such when commingled with community funds in a bank account so long as the amount thereof can be ascertained. Whether separate funds so deposited continue to be on deposit when a withdrawal is made from such a bank account for the purpose of purchasing specific property, and whether the intention of the drawer is to withdraw such funds therefrom, are questions of fact for determination by the trial court." (*Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, 157; 7 Witkin, Summary of Cal. Law (8th ed.) § 33, pp. 5126-5127.) The second method involves a consideration of family expenses. It is based upon the presumption that family expenses are paid from community funds. (*Thomasset* v. *Thomasset, supra,* 122 Cal.App.2d 116, 126; 7 Witkin, Summary of Cal. Law (8th ed.) § 42, pp. 5133-5136.) If at the time of the acquisition of the property in dispute, it can be shown that all community income in the commingled account has been exhausted by family expenses, then all funds remaining in the account at the time the property was purchased were necessarily separate funds. (*See* v. *See, supra,* 64 Cal.2d 778, 783.)

The effect of the presumption and the two methods of overcoming it are succinctly summarized in *See:* "If funds used for acquisitions during marriage cannot otherwise be traced to their source and the husband who has commingled property is unable to establish that there was a deficit in the community accounts when the assets were purchased, the presumption controls that property acquired by purchase during marriage is community property." (*Id.* at p. 784.) Throughout the marriage Esther commingled her community property earnings from her law practice with the rents, issues and proceeds from her separate property in several bank accounts. She concedes that she made no attempt to trace the source of the property by resorting to the "family expense method." We are satisfied from our review of the evidence that Esther failed to keep adequate records to show that family expenses had exhausted

community funds at the time of the acquisition of any of the property here in dispute.

Esther contends, however, that she introduced sufficient evidence to trace the source of the funds used to acquire each item of disputed property to her separate property in accordance with the "direct tracing test" described in *Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144 (see p. 611, *ante*), and that therefore the trial court's finding to that effect is supported by substantial evidence. In *Hicks* the husband introduced evidence of separate property deposits amounting to $267,580.81, consisting of $91,610.90 from dividends, $66,266.70 in proceeds from sales of separate property assets, and $109,703.21 from loans secured by the credit of his separate property. He also introduced evidence of separate property withdrawals in the amount of $172,931.80 and an excess of total separate property deposits over separate property withdrawals in the amount of $94,649.01. The court held that this evidence in combination with evidence showing that the questioned withdrawals were intended to purchase the disputed property as separate property, supported the trial court's finding of separate property.

Esther introduced into evidence a schedule compiled by herself and her accountant from her records which itemized chronologically each source of separate funds, each expenditure for separate property purposes, and the balance of separate property funds remaining after each such expenditure. She received $99,632.02 attributable to her separate property; expended $42,213.79 for separate property purposes, leaving an excess of separate property receipts over separate property expenditures in the amount of $57,418.23 throughout the course of the marriage. Each year from 1958 to 1968, excepting the year 1961, there was an excess of separate property receipts over separate property expenditures, leaving a balance of separate funds. The 1961 deficit did not, however, exhaust the balance of separate funds carried forward from prior years. The schedule demonstrated that Esther's expenditures for separate property purposes closely paralleled in time and amount separate property receipts and thus established her intention to use only her separate property funds for separate property expenditures.

Richard contends that the schedule contains a fatal flaw in that the entries of receipts and expenditures are not tied to any bank account or bank accounts. Therefore, he argues, the schedule shows merely the availability of separate funds on the given dates but fails utterly to demonstrate the actual expenditures of those funds for the enumerated

separate purposes. Esther concedes that she was unable to support the schedule by correlating each itemized deposit and withdrawal on the schedule with an entry in a particular bank account due to the unavailability of various bank records as well as to the lack of such records of her own. Richard urges that this state of the evidence demonstrates that Esther has failed to meet her burden, that she has therefore not overcome the community property presumption, and that her claims to specific property as being her separate property must fall.

■ We agree that the schedule by itself is wholly inadequate to meet the test prescribed by *Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, and to support the trial court's finding that Esther "identified and traced" the separate property. However, the schedule was not the only evidence introduced by Esther to effect the tracing. She personally testified that the schedule was a true and accurate record, that it accurately reflected the receipts and expenditures as accomplished through various bank accounts, although she could not in all instances correlate the items of the schedule with a particular bank account, and that it accurately corroborated her intention throughout her marriage to make these expenditures for separate property purposes, notwithstanding her use of the balance of her separate property receipts for family expenses.

The trial court evidently believed Esther. "The testimony of a witness, even the party himself, may be sufficient." (6 Witkin, Cal. Procedure (2d ed.) § 248, p. 4240.) Viewing this evidence in the light most favorable to Esther, giving her the benefit of every reasonable inference, and resolving all conflicts in her favor, as we must under the rules of appellate review (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; 6 Witkin, Cal. Procedure (2d ed.) § 245, pp. 4236, 4237), we conclude that there is substantial evidence to support the trial court's finding that Esther traced and identified the source and funds of her separate property. We are satisfied that the trial court was warranted in inferring from this evidence that the bank records if introduced would fully verify the schedule as supported by Esther's testimony to the effect that "separate funds . . . continue[d] to be on deposit when a withdrawal [was] made . . . for the purpose of purchasing specific property, and . . . [that] the intention of the drawer . . . [was] to withdraw such funds therefrom . . . ." (*Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, 157.)

Since we conclude that the judgment can be upheld on the basis of an adequate tracing of Esther's separate property, it is unnecessary for us to consider whether it can also be upheld on the independent basis of an

agreement between Richard and Esther as to the separate character of the properties in controversy.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Burke, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.